C. WALTER BAKER, ET UX. *v.* NORMAN OTTO, ET AL., EXECUTORS

[No. 34, October Term, 1941.]

*Decided December 3, 1941.*

54

The cause was argued before BOND, C. J., SLOAN, JOHNSON, DELAPLAINE, COLLINS, FORSYTHE, and MARBURY, JJ.

Submitted on brief by *Ellsworth R. Roulette* for the appellants.

Submitted on brief by *Edward Oswald, Jr.,* and *George N. Oswald,* for the appellees.

DELAPLAINE, J., delivered the opinion of the Court.

This appeal of C. Walter Baker and Nora M. Baker, his wife, is from a decree of the Circuit Court for Washington County dismissing their bill of complaint praying that Norman Otto and Mrs. John McKee, surviving executors of the estate of Annie S. Miller, deceased, be directed to release a certain mortgage executed by the appellants.

It was alleged that the mortgage in the sum of $2,450 covered a vacant lot on North Potomac Street in Hagerstown, but that it had been paid on March 17, 1939. Baker, who was Mrs. Miller's attorney, endeavored to prove that he had paid the entire indebtedness by producing (1) his cancelled check for $2,500 bearing a notation "North Potomac Street lot," and (2) a receipt from Mrs. Miller for $2,500 containing the words "same being payment of mortgage" but not specifying the mortgage. Baker swore that he wrote the notation on the check before he gave it to Mrs. Miller. The chancellor, however, observed that the color of the ink used in making the notation was different from that in the signature. Moreover, the executors showed that on February 23, 1939, Mrs. Miller received a check for $2,500 from Mrs. Mary I. Keedy for

the release of another mortgage, and on its endorsement Baker deposited it in his personal account in the Nicodemus National Bank of Hagerstown. Baker claimed that he accommodated Mrs. Miller on that day by giving her therefor $2,500 in cash, but did not obtain a receipt.

The general rule is firmly established both at common law and in equity that any disputed transaction between attorney and client is *prima facie* fraudulent and invalid, and the burden is upon the attorney to show that he used no undue influence or deception but that the transaction was fully understood and fair in all respects. Justice Story observed that this rule was established on account of "the importance of preventing a general public mischief, which may be brought about by means, secret and inaccessible to judicial scrutiny, from the dangerous influences arising from the confidential relation of the parties." 1 Story, Equity Jurisprudence, sec. 311. The rule is founded on public policy because the confidential and fiduciary relationship enables an attorney to exercise a very strong influence over his client and often affords him opportunities to obtain undue advantages by availing himself of the client's necessities, credulity and liberality. Courts of equity consequently watch over such transactions with great solicitude and exercise the most exact scrutiny to be certain that the attorney has taken no unfair advantage of his client. *Merryman v. Euler*, 59 Md. 588, 43 *Am. Rep.* 564; *Etzel v. Duncan*, 112 Md. 346, 76 A. 493; *McLean v. Maloy*, 136 Md. 467, 513, 111 A. 91, 107; *Rhodes v. Ries*, 99 N. J. Eq. 638, 133 A. 712; 23 *Am. Jur., Fraud and Deceit*, sec. 14.

Objection was made to the admission of evidence regarding the check for $2,500 given by Mrs. Keedy to Mrs. Miller and its deposit to the use of C. Walter Baker. The appellants contended that this evidence confused the chancellor. It is a fundamental principle that an attorney at law is an officer of the court sworn to aid in the administration of justice and held to *uberrima fides* in all his professional dealings. *Gould v. State*, 99 Fla. 662, 127 So. 309, 69 *A. L. R.* 699. When a transaction be-

tween attorney and client is attacked, the presumption of fraud can be overcome only by the clearest and most satisfactory evidence. *Moore v. Rochester Weaver Mining Co.*, 42 Nev. 164, 174 P. 1017, 19 *A. L. R.* 830. The extreme degree of care required for the correction of abuses of confidence was recognized by Chief Judge Robinson in the following words: "No part of the jurisdiction of the court is more useful, it has been said, than that which it exercises in watching and controlling transactions between parties standing in a relation of confidence to each other. * * * The broad principle * * * is that wherever there exists such a confidence * * * the court will not allow any transaction between the parties to stand, unless there has been the fullest and fairest explanation and communication of every particular resting in the breast of the one who seeks to establish a contract with the person so trusting him." *Zimmerman v. Bitner*, 79 Md. 115, 126, 28 A. 820, 821, 822. In determining whether an attorney or any other beneficiary in a confidential relationship has met the burden of proof which the law casts upon him, the court must consider all the facts and circumstances in each particular case. *Mead v. Gilbert*, 170 Md. 592, 606, 185 A. 668. The attorney involved in the present case has been engaged in the practice of law since his admission to the bar in 1916; his client, a widow 87 years old, obviously reposed implicit trust in him. Where a client is aged, or where the attorney has an aggressive or dominating· personality while his client is easily influenced, the burden imposed upon the attorney to sustain any dealings with his client is extremely stringent. *McKnight v. Gizze*, 107 Conn. 229, 140 A. 116; *Armstrong v. Morrow*, 166 Wis. 1, 163 N. W. 179, *Am. Cas.* 1918E, 1156; 5 *Am. Jur., Attorneys at Law*, sec. 48; 7 *C. J. S., Attorney and Client*, sec. 127.

The law in this State is explicit that a release of a mortgage may be written either on the original mortgage and then filed or on the record in the office where the mortgage is recorded, and a release executed in either

of these ways is sufficient to release the mortgage as fully and effectually as any separate instrument could do. Code, Art. 21, Secs. 38-44. It is incredible that a lawyer, familiar with the methods of release of mortgages, would make full payment of a mortgage without obtaining its release, unless he can make some satisfactory explanation. The only excuse offered in this case was that Mrs. Miller was unable to get the mortgage out of her safe deposit box on account of an accident which resulted in her death. According to the record, however, Mrs. Miller died on November 21, 1939, and as the accident did not happen until a few days prior to her death, she had eight months in which to execute the release. Although Baker admitted that he had been greatly in need of cash to pay his obligations, yet when interrogated as to how he happened to have $2,500 in cash, and whether he had earned it or borrowed it, he refused to answer. It was also not made clear how long he had kept the money. When asked whether his office was equipped with an iron safe, he answered: "I don't know. I think it is all right." Questioned about the denominations of the currency, he said: "I cannot tell you. They were not too big. They were $20. I cannot tell exactly."

Otto, executor, testified that when he and Mrs. McKee, executrix, and their attorney, Edward Oswald, Jr., called upon Baker in 1940 to ask for settlement, Baker told them that he had given Mrs. Miller a check for $2,500 and a dollar and some cents in cash, since the interest amounted to more than $51. While Baker testified that he had paid her more than $50 in interest, he gave no reason to explain why the receipt was for the exact sum of $2,500. When asked to give the date from which he calculated the interest he declared: "I cannot tell you that." Moreover, the executors showed that a payment of $81.84 was charged against Baker's account on March 16, 1939; they maintained that this check undoubtedly included the semi-annual interest of $73.50 on the mortgage in question and the monthly interest of $8.34 on a mortgage executed by the Arcade Realty and Mortgage

Company, of which Baker was president. It was also disclosed that a payment of $73.50 was charged against Baker's account on September 19, 1939, and that Mrs. Miller deposited $73.50 in her account on the same day. Concerning these records Baker observed: "That is what they say, but I do not have any such check." After having said that his own records would show what the payment of $73.50 was for, he was given an opportunity to bring his check stubs and other records relating to the case; but when court reconvened he failed to produce his stubs or any other material records. He informed the court that he was unable to locate the cancelled check, and could not recall what it was for. While he did not deny that he had paid Mrs. Miller $73.50 on September 19, 1939, he swore that this payment was not for interest on the mortgage in question. Finally, when pressed to state whether he had any idea what the check was for, he replied vaguely: "Well, no, I cannot say I do. It was in payment of interest due Mrs. Miller. It might have been from several different sources or the continuation of several different things."

Considering all the facts and circumstances in the case, the court holds that the evidence submitted by the appellants was not sufficiently clear and satisfactory to discharge the burden of proof. The decree of the chancellor dismissing the bill of complaint must therefore be affirmed.

*Decree affirmed with costs.*

BOND, C. J., filed the following separate opinion.

As the fact in issue was only that of payment of the mortgage debt, it seems to me the decision is not affected by the confidential relation of the parties; but I agree that payment was not proved, and that the decree must therefore be affirmed.